[Civ. No. 5290.   Third Appellate District.—November 16, 1935.]

J. H. DAVISON, Respondent, v. THE DIAMOND MATCH COMPANY (a Corporation), Appellant.

Fred C. Pugh, Pugh & Pugh and H. Eugene Chalstran for Appellant.

Wetter & Rankin for Respondent.

PULLEN, P. J.—This appeal arose out of a cause of action for an assault and battery. The plaintiff originally set forth two causes of action, one for an assault and the second for maliciously obstructing a certain roadway, whereby plaintiff had ingress and egress to and from his ranch.

At the conclusion of plaintiff's case a nonsuit was granted as to the second cause of action. Upon submission of the cause, a jury, on the first cause of action, alleging assault and battery by defendant Pitkin, maliciously brought about by the direction of defendants, The Diamond Match Company, a corporation, Richard A. Colgan, Jr., and Edmond Cameron, found in favor of defendants Colgan, Cameron and Pitkin and against The Diamond Match Company, fixing the general damages as $500 and $1,500 for exemplary damages.

Appeal here is by The Diamond Match Company from the judgment based upon these two verdicts. The original quarrel was between The Diamond Match Company and plaintiff and others as to whether a certain road leading through the company's timber lands was the private way of The Diamond Match Company or whether the same was a public highway. The company had for several years maintained gates or barriers across the road during the summer seasons as a protection against fires from hunters and campers particularly, and had a few years prior to this action, brought an action against

certain of the land owners in the territory to have the status of the road determined. The Supreme Court, after a trial in the superior court, where judgment was entered against the company, affirmed that judgment and found the road to be a public highway and directed the same to be opened. (*Diamond Match Co.* v. *Savercool*, 218 Cal. 665 [24 Pac. (2d) 783].) Pending the appeal and also during the interval between the affirmance of judgment and the coming down of the *remittitur* the company maintained their gatemen at the barrier to prevent the use of the road by the general public. It was during this latter interval that the altercation hereinafter described took place.

Plaintiff was a land owner within the area and the only means of access he had to his lands was by use of this road or highway. Very shortly after the judgment had been affirmed in the case of *Diamond Match Co.* v. *Savercool, supra,* plaintiff sought legal advice and was informed that he need no longer recognize the claim of the company to impede or obstruct the use of the highway. Accordingly, one day as he was on his way to Redding, he drove his truck against the gate or barrier, thereby destroying it. Upon his return trip later the same day the gate had been repaired, and was opened by the gateman prior to his arrival; he, however, drove his truck part way through the gate and stopped. He then proceeded to alight from his truck, and as the aggressor, took an axe and advanced toward the obstruction with the declared purpose of cutting the gate away. Thereupon Pitkin, one of the gatemen, endeavored to prevent his accomplishing that purpose and the two engaged in a physical encounter and the plaintiff was unable to accomplish his purpose. It was in this scuffle that plaintiff sustained the injuries complained of, upon which this action is based.

█ Appellant upon appeal here contends that the judgment entered upon the verdict exonerating Colgan, Cameron and Pitkin, agents of The Diamond Match Company and assessing damages against appellant, exonerated appellant company.

Appellant also claims plaintiff failed to produce any evidence of malice, fraud or oppression and thereupon no foundation was laid for an award of punitive damages; also that the verdict was the result of passion and prejudice incited by improper argument by counsel for plaintiff.

Our conclusion makes it necessary to consider only the first point presented. The Diamond Match Company is a corporation owning a large tract of timber in the area of the barrier and highway here in question. Richard A. Colgan, Jr., was sawmill superintendent and forester of the California lands belonging to the company; Edmond Cameron was a land owner in the neighborhood who supervised the maintenance of the gate across the highway at the request of Colgan, but was not an employee of the company. Colgan had never met Pitkin nor Lee, gateman, prior to their employment by Cameron. The instructions to Robert Lee, a defendant herein and one of the gatemen, as given him by Cameron were that he would furnish them with a list of Davison's friends as soon as possible but in the meantime to let Davison's people, friends or relatives go through; also that if anybody came up and got too bad "don't have any trouble with him but open the gate and let him go through". Cameron also told him that if they could hold off anyone seeking to go through the gate for a small argument it would be all right. Mr. Colgan, the officer of the company, instructed Mr. Cameron, to whom he had given authority over the gate, "To let anyone through the gate who had property rights or interests beyond the gate, and further than that not to be hard boiled with anyone who had a real reason for going into that country and not creating an extra hazard." He also instructed Mr. Cameron that Mr. Davison should be allowed to go through as he always had been, and his friends also. Mr. Cameron testified he gave practically the same instructions to the gatemen that he had received from Colgan. Mr. Pitkin, one of the gate tenders, the only employee who engaged in the scuffle, testified that he was instructed by Mr. Cameron to have no trouble whatever and if anyone used force to break down the gate or anything to let them go through. This briefly constituted the uncontradicted instructions received by the gatemen. After the difficulty between Davison and Pitkin, Colgan was asked if he ever expressed approval of the act and he said that he did not. Cameron, immediately upon hearing of the difficulty, told Pitkin he did not approve of the fight or fighting at the gate or having any trouble over the gate and that he did not approve of anything of that nature.

In view of the foregoing we fail to see wherein appellant could be considered as a joint tort-feasor with Pitkin, Colgan

and Cameron. The evidence does not establish any personal participation on the part of the corporation or wherein its employee was in any way carrying out its expressed or implied instructions in applying force to Davison. The jury by their verdict have exonerated Pitkin the principal, thereby declaring in fact that he has done no wrong, and therefore the principal cannot be held responsible for the agent if the agent has himself committed no tort. Many cases support this well-defined rule, among others, *Bradley* v. *Rosenthal,* 154 Cal. 420 [97 Pac. 875, 129 Am. St. Rep. 171]; *Fimple* v. *Southern Pac. Co.,* 38 Cal. App. 727 [177 Pac. 871]. In the latter case the court stated: " . . . where the injury is solely the result of the negligence of the servant while performing his duties as such, the principal's liability for such injury can follow only from the relationship existing between the master and servant as such. They are not joint tort-feasors, so that either or both may be sued for the tort committed."

In the case of *Doremus* v. *Root,* 23 Wash. 710 [63 Pac. 572, 54 L. R. A. 649], it was said, "The act of an employee, even in legal intendment, is not the act of the employer, unless the employer either previously directs the act to be done or subsequently ratifies it. For injuries done by the negligent act of an employee not directed or ratified by the employer the employee is liable because he committed the act which caused the injury, while the employer is liable, not as if the act was done by himself, but because of the doctrine of *respondeat superior,* —the rule of law which holds the master responsible for the negligent act of his servant committed while the servant is acting within the general scope of his employment, and engaged in his master's business. The primary liability to answer for such an act therefore rests upon the employee, . . . "

The foregoing principle finds support in the following cases: *Tolley* v. *Engert,* 71 Cal. App. 439 [235 Pac. 651]; *Thompson* v. *Southern Pacific Co.,* 31 Cal. App. 567 [161 Pac. 21]; *Benson* v. *Southern Pacific Co.,* 177 Cal. 777 [171 Pac. 948]; *Bosse* v. *Marye,* 80 Cal. App. 109 [250 Pac. 693]; *Triano* v. *F. E. Booth & Co., Inc.,* 120 Cal. App. 345 [8 Pac. (2d) 174]; *Charles H. Duell, Inc.,* v. *Metro-Goldwyn-Mayer Corp.,* 128 Cal. App. 376 [17 Pac. (2d) 781]; *Shippy* v. *Peninsula Rapid Transit Co.,* 97 Cal. App. 367 [275 Pac. 515]..

We find no evidence in the record wherein Pitkin was instructed either directly or by implication to exert physical

force in preventing anyone from passing through the gate, or to fight for its maintenance, and unless the employer has either directed or subsequently ratified the act complained of it cannot be held to have been the act of the employer. As was said by Chief Justice Beatty in *Rahmel* v. *Lehndorff*, 142 Cal. 681 [76 Pac. 659, 100 Am. St. Rep. 154, 65 L. R. A. 88] : "The wrongful act must be one which the servant is empowered under some circumstances to do."

It is true that when Pitkin was asked upon examination why he did not step aside when respondent told him he intended to remove the gate from the road he replied: "Because I was hired to protect The Diamond Match property," and also why he Pitkin, stopped those seeking to go through the gate he said, "Because that was what I am hired to do." However, we have no evidence of such orders from anyone and the foregoing answers are based upon the conclusion of the witness as to what his instructions were.

Respondent strongly relies upon the case of *McInerney* v. *United Railroads, etc.,* 50 Cal. App. 538 [195 Pac. 958]. There a strike was in progress among the employees of the United Railroads, and was being resisted by the company, and with the aid of other persons replacing the strikers, was attempting to operate its street cars and to prevent injury to its property. The president of the company had instructed his subordinates to employ guards and "to spare no expense necessary to keep the cars running or necessary for the protection of passengers or the company's employees or the company's property".

Fitch, one of the defendants, was an employee of the railroad and on the evening in question was sent out in company with several others "to do patrol work on the street, to try and protect the property in any way they could—I would not say in any way they could, but to do anything they reasonably could to stop windows from being broken, crews pulled off cars, to help them out". Mistaking plaintiff for one who was interfering with the operation of the cars, defendant and his companion seized him, violently assaulting him and subsequently caused his arrest. It was later discovered that they had assaulted a private citizen, in no way connected with the strike and innocent of the charge or suspicion of defendant. Plaintiff brought an action against the United Railroads and several of the individuals who took part in the assault. Upon

the trial the jury found in favor of defendant Fitch and against the railroad. The railroad; upon appeal, contended, among other things, that the verdict in favor of defendant Fitch exonerated it from liability. But the court held that the directions given Fitch by the company were broad enough to contemplate the use of force and violence, if necessary, in repelling the assaults of strikers or in arresting those injuring or destroying company property. Fitch was therefore but obeying orders and even if through mistaken zeal he exceeded his duty the company would be liable not merely under the doctrine of *respondeat superior* but as a joint participant also in the wrongful acts. In the instant case, however, we do not find instructions to the gatemen that could call for the use of force or violence and therein lies the distinction between the instant case and the cited case.

Many other points are raised and argued but we do not deem it necessary to discuss them.

We are therefore compelled to the conclusion that the jury by exonerating the defendants Colgan, Cameron and Pitkin have thereby exonerated The Diamond Match Company from liability, and the judgment entered upon the verdict of the jury awarding judgment against The Diamond Match Company should be reversed, and it is so ordered.

Thompson, J., and Plummer, J., concurred.